UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GENNA B. LAABS, individually and as
a representative of a class of participants
and beneficiaries of the Faith Technologies
Inc. 401(k) Retirement Plan,

        Plaintiff,

v.                                      Case No. 20-C-1534

FAITH TECHNOLOGIES, INC., et al.,

        Defendants.

---

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS IN PART AND DENY THE MOTION IN PART

---

Plaintiff Genna B. Laabs, a participant in the Faith Technologies, Inc. 401(k) Retirement Plan (the Plan), has brought a proposed class action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(2), against Defendants Faith Technologies, Inc., the board of directors of Faith Technologies, Inc., and John Does 1–30. United States District Judge William C. Griesbach has referred the case to me to address any motions. This report and recommendation addresses the defendants' motion to dismiss, which I recommend the court grant in part and deny in part.

### LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *Zemeckis v. Global Credit*

& *Collect. Corp.*, 679 F.3d 632, 634–35 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim satisfies this pleading standard when its factual allegations 'raise a right to relief above the speculative level.'" *Zemeckis*, 679 F.3d at 635 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). When analyzing a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Johnson v. Enhanced Recovery Co.*, 961 F.3d 975, 980 (7th Cir. 2020) (citing *Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019)). In the ERISA context, the Seventh Circuit has held that, "[w]hen claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable." *Divane v. Nw. Univ.*, 953 F.3d 980, 988 (7th Cir. 2020) (citation omitted).

## BACKGROUND

In September 2018, Faith Technologies hired the plaintiff initially in the position of apprenticeship assistant and then in the position of talent development coordinator. Compl. ¶ 11, Dkt. No. 1. The plaintiff's employment with Faith Technologies ended on September 2, 2020. *Id.* ¶ 12. Faith Technologies is the plan sponsor and plan administrator of the Faith Technologies Inc. 401(k) Retirement Plan. *Id.* ¶ 20. The Plan is a "defined contribution" pension plan under 29 U.S.C. § 1102(2)(A), meaning that employees may make pre-tax investments through payroll deductions. *Id.* ¶ 34. The Plan has about $172,000,000 in assets and 3,399 participants. *Id.* ¶¶ 27–28.

The essence of the complaint is the allegation that the Plan's fees were excessive when compared with other, comparable 401(k) plans offered by other sponsors that were similarly funded. *Id.* ¶ 68. The high fees were a product, the plaintiff claims, of the defendants' breach of their fiduciary duties. Specifically, the defendants allegedly (1) failed to objectively and

2

adequately review the Plan's investment portfolio to select low-cost investment options; (2) maintained certain funds in the Plan despite the availability of cheaper options that were identical or similar; (3) failed to monitor the recordkeeping and administration fees paid by the Plan, resulting in higher-than-necessary fees, and (4) approved the use of the "GoalMaker" asset allocation service furnished by the recordkeeper, which charged excessive fees. *Id.* ¶ 69. Defendants' recordkeeper during the Class Period was Prudential. *Id.* ¶ 82.

In addition, the plaintiff alleges that the defendants did not engage in an objectively reasonable process when selecting funds for the Plan. *Id.* ¶ 138. She further alleges that the investment options selected by the Plan fiduciaries were 520% more expensive than prudent, alternative, and less expensive options covering the same asset category. *Id.* ¶ 133. She alleges that, had they acted in the best interests of the Plan's participants, the defendants would have selected funds with lower investment expenses than those funds actually selected by the defendants. *Id.* ¶ 141. Ultimately, because the defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, they caused objectively unreasonable and unnecessary losses to the plaintiff and the Plan's participants in the amount of approximately $2,622,348 through 2018. *Id.* ¶ 151.

The complaint further alleges that Faith Technologies made Prudential's proprietary asset allocation service called "GoalMaker" available to plan participants. *Id.* ¶ 155. GoalMaker is a service that, for participating plan participants, purports to make investments from the Plan's menu for the participant and rebalances them on an ongoing basis. *Id.* ¶ 156. The plaintiff alleges that the defendants did not have the competence, exercise the diligence, or have in place a viable methodology to monitor the GoalMaker allocation service and

3

investment options. *Id.* ¶ 162. She claims that the defendants knew or should have known that GoalMaker was designed to steer plan participants' retirement savings to investment options that paid investment management fees and kickbacks to Prudential. *Id.* Plaintiff also alleges that the defendants had an obligation to monitor the fees and performance of the Prudential Guaranteed Income Fund (Prudential GIC) and to remove or replace it, but the defendants did not have a viable methodology for monitoring the costs or performance of that fund. *Id.* ¶¶ 172–73. The plaintiff asserts that the Prudential stable value fund was imprudent and should have been removed from the Plan. *Id.* ¶ 186.

Finally, the plaintiff alleges that Faith Technologies engaged in self-dealing by paying itself for providing unspecified services to the Plan. *Id.* ¶ 187. She also claims that the defendants failed to fully disclose fees charged to the Plan participants in their quarterly statements and participant fee disclosure documents. *Id.* ¶ 195. She alleges that Plan participants were unable to determine the actual Net Investment Expense paid by Plan participants for each of their investment options. *Id.* ¶ 202. This caused harm because she did not have all the information necessary to make an informed investment decision. *Id.* ¶¶ 208–09.

The complaint asserts five claims for relief: breaches of duties of loyalty and prudence regarding recordkeeping and administration fees (Count I); breaches of duty of loyalty and prudence regarding investment management fees (Count II); failure to adequately monitor other fiduciaries regarding recordkeeping and administration fees (Count III); failure to adequately monitor other fiduciaries regarding investment management fees (Count IV); and engaging in prohibited party-in-interest transactions (Count V).

# ANALYSIS

## A. Article III Standing

Defendants assert that the plaintiff lacks Article III standing for most of her claims. Article III of the United States Constitution limits the jurisdiction of federal courts to actual "cases" and "controversies" brought by litigants who demonstrate standing. *Garcia v. SigmaTron Int'l, Inc.*, 986 F.3d 1058, 1063 (7th Cir. 2021). "The familiar 'triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." *Id.* at 1064 (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103–04 (1998)). The plaintiff bears the burden of establishing each element. *Id.* (citation omitted). "There is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). Therefore, a plaintiff who raises multiple claims "must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Citing the Supreme Court's recent decision in *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020), the defendants assert that the plaintiff lacks standing to assert claims related to plan options in which she did not invest. In *Thole*, the plaintiffs, who were participants in a defined-benefit plan, filed a putative class action alleging the defendants breached their duties of loyalty and prudence by mismanaging the plan and poorly investing the plan's assets. *Id.* at 1618. The Supreme Court held that the plaintiffs lacked Article III standing to maintain their suit because, as defined-benefit participants, the plaintiffs had been paid "all of their monthly benefit payments" and were "legally and contractually entitled to receive those same monthly payments for the rest of their lives." *Id.* The Court explained that the plaintiffs did not show that they had a "concrete stake" in the lawsuit because, win or lose, the plaintiffs "would still

5

receive the exact same monthly benefits that they [were] already slated to receive." *Id.* The Court also rejected the plaintiffs' assertion that they had standing as representatives of the plan itself, noting that the plaintiffs needed to meet their own Article III standing requirements before claiming the interests of others. *Id.* at 1620.

Defendants assert that *Thole* applies to the facts here. But the Plan in this case is a defined contribution plan, not a defined benefit plan. The Supreme Court explained that it was "[o]f decisive importance" that the case involved a "defined-benefit plan, not a defined-contribution plan," because the plaintiffs received a fixed payment that did "not fluctuate with the value of the plan or because of . . . [any] investment decisions." *Id.* In this case, by contrast, the plaintiff has satisfied the requirements of Article III standing for her breach of fiduciary duty claims by alleging actual injury to her own Plan accounts and an injury in fact that is causally related to the conduct she challenges on behalf of the Plan. Because the plaintiff has alleged her own injury in fact, she has standing to assert claims on behalf of other affected Plan participants. Accordingly, the plaintiff has standing to assert all the fiduciary duty claims brought in this action even though she did not invest in each of the plan options at issue.

The plaintiff has failed to establish standing to pursue her prohibited transaction claim, however. She alleges that, in 2017, Faith Technologies engaged in a single prohibited transaction by paying itself for providing some "unspecified services" to the Plan. Compl. ¶ 187. But the plaintiff did not have a plan account in 2017. Because the plaintiff was not a Plan participant in 2017, she did not suffer any particularized injury to her Plan account from the transaction. Therefore, the plaintiff lacks standing to pursue the prohibited transaction claim. *See DaimlerChrysler Corp.*, 547 U.S. at 352 (noting that plaintiff who raises multiple claims "must demonstrate standing for each claim he seeks to press").

B. **Breach of Fiduciary Duties**

The plaintiff alleges that the defendants breached their fiduciary duties by causing the Plan to pay excessive recordkeeping costs, offering high-cost funds, failing to disclose revenue-sharing information to participants, and failing to follow a prudent process in selecting Prudential's GoalMaker Asset Allocation Service. "In order to state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quoting *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 464 (7th Cir. 2010)). "A fiduciary must behave like a prudent investor under similar circumstances." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). A fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

1. **Recordkeeping Fees**

The plaintiff first alleges that the defendants breached their fiduciary duties by allowing the Plan to pay excessive recordkeeping fees. "Defined contribution plans require recordkeepers to track the amount of each participant's account and how the account is allocated among investment options. Recordkeepers also maintain websites for participants and sometimes provide investment advice or education materials." *Divane,* 953 F.3d at 984. The complaint alleges that the defendants failed to use a prudent process because they did not put recordkeeping services out for competitive bidding on a regular basis. Compl. ¶¶ 88–98. As a result, the plaintiff asserts, the recordkeeping fees paid by the Plan greatly exceeded the

7

normal range for plans its size and were more than twice what the Plan should have paid. *Id.* ¶¶ 104–06.

The plaintiff alleges that, from the years 2014 through 2018, the Plan had, on average, 2,636 participants and paid an average effective annual recordkeeping and administration fee of at least approximately $290,376, which equates to an average of at least $110 per participant. *Id.* ¶ 100. She also claims that, for the same period, the annual recordkeeping and administration fees paid by other plans of similar sizes with similar amounts of money under management ranged from $41 to $73. *Id.* ¶ 101. Based on this information, the plaintiff asserts that a prudent Plan fiduciary would have obtained an effective annual recordkeeping and administration fee of around $51 per participant. *Id.* ¶ 104. In sum, the plaintiff alleges that because the defendants did not shop around for better prices, the Plan cost its participants a total minimum amount of approximately $779,702 in unreasonable and excessive recordkeeping and administration fees. *Id.* ¶ 108.

In seeking dismissal, the defendants rely on the Seventh Circuit's decision in *Divane,* 953 F.3d at 980.[1] There, the Seventh Circuit rejected a plaintiffs' theory that a defendant breached its fiduciary duty by failing to solicit quotes or competitive bids for recordkeeping services, observing that the defendant "was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked." *Id.* at 991. Although it's true that the court found the defendant wasn't required to solicit bids for a low-cost recordkeeper, the *Divane* court was responding to a wholly different argument. There, the plaintiff had argued that the plan administrators "should have solicited competitive bids for a

---

[1] The Supreme Court recently granted the petition for s writ of certiorari in this case and scheduled it for oral argument on December 6, 2021.

fixed per-capita fee ($35 per year per participant) *by a single recordkeeper instead of using two separate recordkeepers,* TIAA and Fidelity. According to plaintiffs, multiple recordkeeping arrangements impose higher costs on plan participants." *Id.* (italics added). The plaintiff's beef in *Divane* was that the defendant was wasting money by using *two* different recordkeepers, and the court disagreed: "We disagree with plaintiffs' theory that Northwestern was required to seek a sole recordkeeper to satisfy its fiduciary duties." 953 F.3d at 990. Here, by contrast, we only have one recordkeeper, and the plaintiff is simply alleging that the defendants did not shop around for a better price for recordkeeping fees—an allegation never raised in *Divane*. Ultimately, because the argument raised here did not arise in *Divane,* its narrow holding that it was prudent for Northwestern to use two recordkeepers cannot somehow be extended to insulate fiduciaries from any obligation to monitor fees or to obtain reasonable prices for their plan participants. A fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

Another important distinction in *Divane* is the court of appeals' recognition that the plan provider, TIAA-CREF, essentially *required* the plans to use it as a recordkeeper: "If Northwestern removed TIAA and hired a third-party recordkeeper, participants would have lost access to the Traditional Annuity and any funds invested in the annuity would have been subject to the 2.5% surrender charge. We disagree with plaintiffs' theory that Northwestern was required to seek a sole recordkeeper to satisfy its fiduciary duties, finding Northwestern's decision to maintain two recordkeepers prudent." *Id.* at 990. Given the stiff penalty for *not* using TIAA-CREF as a recordkeeper, the court found that the plan acted reasonably in using

TIAA-CREF as a recordkeeper. In essence, TIAA-CREF had provided a bundle of related recordkeeping services and funds, and the court viewed them all together. Here, by contrast, neither side has suggested that the Plan was required to use Prudential as a recordkeeper, nor that there would have been a penalty for Faith Technologies to shop around. If anything, the entire premise of the claim, as alleged in the complaint, is that the defendants had free rein to seek bids from third-party recordkeepers, many of whom would have provided cheaper yet comparable services. Compl. at ¶¶ 36, 47.

The defendants also argue that the fees in this case were lower than what was at issue in *Divane,* which means there can be no plausible inference of imprudence. However, *Divane* did not purport to create some kind of safe harbor or *per se* rule insulating a range of fees from scrutiny. As both sides recognize, courts evaluating the fiduciary's performance look to the *process* used. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014). The process here is alleged to be imprudent, and the complaint has cited examples of less expensive providers in support of the plausibility of that allegation. The fees charged in any instance will depend on market forces, the plan's bargaining power, inflation, and other factors, and so what's appropriate in one case might be vastly exorbitant in another. Nothing in *Divane*, or any other controlling precedent, suggests that courts should summarily grant motions to dismiss when the fees complained about are lower than a certain threshold.

The defendants further argue that the mere fact that other companies were able to obtain lower fees does not mean that Prudential's fees were unreasonable. True enough. But it should be clear that, although the plaintiff has provided a chart suggesting that the fees charged to plan participants far exceed what's reasonable, the plaintiff is not suggesting that a fee discrepancy *in and of itself* creates a cause of action. At the pleadings stage, we don't

10

know what services the comparator companies provided or whether they received additional compensation from participating plans. Instead, the discrepancies between what allegedly comparable plans were paying and what the defendants paid are a possible indication of any damages that might have resulted from the defendants' failure to solicit bids from any other third-party recordkeeping providers or negotiate with Prudential to obtain a better price. In short, the discrepancies tell a plausible story, suggesting that the failure to shop around or negotiate with Prudential had real-world implications.

This case is more like *George v. Kraft Foods Glob., Inc.,* than *Divane*. There, a defined contribution plan hired the recordkeeping company Hewitt "after requesting bids from various recordkeepers." 641 F.3d 786, 798 (7th Cir. 2011). The plan eventually extended Hewitt's contract several times, each time relying on the advice of consultants as to the reasonableness of Hewitt's fees. "However, since initially hiring Hewitt in 1995, the fiduciaries have not solicited competitive bids from other recordkeepers." *Id.* The district court granted summary judgment, but the Seventh Circuit reversed, finding that a jury should be allowed to hear from the plaintiff's expert. *Id.* at 799. The expert would have testified that "prudent fiduciaries would have solicited competitive bids before extending Hewitt's contract, and that defendants' failure to solicit bids caused them to overpay Hewitt by at least $16 per participant per year." *Id.* at 798–99. The court concluded that "a reasonable trier of fact could have credited [the expert's] opinions and concluded that defendants' failure to solicit bids was imprudent." *Id.* at 798–99.

*Kraft Foods* does not stand on its own. For example, in *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014), the Eighth Circuit affirmed the district court's conclusion, after a sixteen-day bench trial, that the defendants had breached their fiduciary duties by failing to

11

monitor recordkeeping fees. They failed "diligently to investigate Fidelity and monitor Plan recordkeeping costs . . . and failed to (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees . . ." *Id.* Similarly, following an eight-day bench trial, the court in *Ramos v. Banner Health,* 461 F. Supp. 3d 1067, 1133 (D. Colo. 2020), found a breach of fiduciary duties when the fiduciary "has not undertaken a single RFP in nearly 20 years, despite the recognized utility of an RFP for assessing reasonableness of fees."

> Evidence in the record supports a finding that had the RPAC acted in a prudent manner and investigated the reasonableness of the recordkeeping and administrative fees being paid to Fidelity, it would have discovered that other similarly situated plans had significantly lower per-participant recordkeeping fees, even when considering the generous array of services offered by Fidelity. The evidence also supports a finding that had the RPAC acted on this information and used the Plan's significantly increasing assets and participants as negotiating leverage—either with Fidelity or another recordkeeper—it could have negotiated more favorable recordkeeping fees for the same level and quality of recordkeeping and administrative services.

*Id.* at 1106-07.

And in *Spano v. The Boeing Co.* the court applied *Kraft Foods* to find—at the summary judgment stage—that the plaintiff had presented a jury question as to whether the fiduciaries' failure to solicit bids was imprudent. 125 F. Supp. 3d 848, 865 (S.D. Ill. 2014). "A reasonable trier of fact could credit these experts' opinions to conclude that Defendants' failure to solicit bids was imprudent." *Id.* Likewise, in *Cassell v. Vanderbilt Univ.,* 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018), the court denied a motion to dismiss, finding that "Plaintiffs have made specific factual allegations that a competitive bidding process would have benefitted the Plan.

12

It is plausible from those facts to infer that Defendants could have obtained less expensive record-keeping services by soliciting competitive bids."

By contrast, the court in *Marshall v. Northrop Grumman Corp.,* declined to find imprudence because "Defendants conducted an RFP before hiring Hewitt, benchmarked Hewitt's fees using an external consultant in 2010, and renegotiated recordkeeping fees in 2011. After the early-termination fee expired, NGSP's fiduciaries put its recordkeeping contract out to bid in 2014, conducted an RFP, and entered into a new contract with Fidelity effective April 2016." No. 216CV06794ABJCX, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019). In other words, because the defendant *did* put the recordkeeping contract out for bids, no reasonable factfinder could find imprudence.

Here, we are merely at the pleadings stage. The plaintiff has alleged, as in *Kraft Foods* and the other cases cited above, that the defendants' failure to solicit bids and negotiate with Prudential was imprudent, and that it caused losses. Nothing within *Divane* suggests that it was overruling *Kraft Foods.* Instead, as noted earlier, the *Divane* court was addressing very specific challenges that were not raised either in *Kraft Foods* or this case; in particular, the court found that the defendants' decision to use the recordkeeper in question was reasonable because they had little choice. Here, by contrast, the complaint alleges that there were no strings attached and that the defendants could have shopped around for third-party recordkeepers, but didn't. They also could have used the Plan's leverage as a larger fund to negotiate better prices.

In sum, the complaint alleges that the Plan had more participants and more assets than 99% of defined contribution plans that filed Form 5500 in the United States. ECF No. 1 at ¶ 26. It further alleges that the market for recordkeeping services is "highly competitive,

13

particularly for a Plan like defendants' with large numbers of participants and large amounts of assets." *Id.* at ¶ 37. In addition, the plan's fiduciaries may solicit competitive bids and negotiate with its current provider to provide the same services for a lower fee. *Id.* at ¶¶ 72, 74. Despite the Plan's market power and the alleged ease of soliciting other bids and / or negotiating with Prudential, the complaint alleges that the defendants: (1) never monitored the Plan's fees and (2) never solicited quotes or competitive bids from Prudential or other providers. *Id.* at ¶¶ 90–92. This resulted in the Plan paying fees that were significantly higher than they would have been. *Id.* at ¶ 97. As in *Kraft Foods,* these allegations state a plausible claim for a violation of fiduciary duty.

2. **High-Cost Funds and Stable Value Investments**

The plaintiff further alleges that the defendants breached their fiduciary duty by offering higher-cost actively managed investments. Compl. ¶ 148. The plaintiff does not raise a categorical opposition to actively managed funds, recognizing that it's acceptable in some cases for such funds to be part of a mix offered by a plan. Instead, she asserts that the defendants breached their fiduciary duty by failing to make a specific and informed finding regarding the cost of the specific investment options in the Plan. *Id.* ¶ 124. The complaint contains comparative tables, which the plaintiff asserts raise an inference that the defendants engaged in an imprudent process when selecting those investments during the statutory period. *Id.* ¶¶ 129–49. Similarly, the plaintiff asserts that the defendants breached their fiduciary duty by offering the Prudential GIC, a stable value investment, given its excessive

spread fees and lack of diversification. Compl. ¶¶ 173–86. She asserts that Faith Technologies should have selected the less expensive "Benchmark GIC."

Unlike above, *Divane* is controlling here. Under *Divane*, "plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty." *Divane*, 953 F.3d at 992; *see also Loomis*, 658 F.3d at 670 ("By offering a wide range of options . . . [a] plan complie[s] with ERISA's fiduciary duties."); *Hecker*, 556 F.3d at 586. In this case, the complaint indicates that the Plan offered a diverse mix of investments including several Vanguard index funds with almost negligible fees. Compl. at ¶ 129. The fact that the Plan also offered certain actively- managed options or a certain stable value fund does not establish that the defendants acted imprudently. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586. As the *Divane* court held, "the types of funds plaintiffs wanted (low-cost index funds) were and are available to them, eliminating any claim that plan participants were forced to stomach an unappetizing menu." *Divane,* 953 at 991 (internal quotation marks omitted). Thus, because plan participants could avoid the high-fee funds if they wanted to, the fiduciary performed its role adequately.[2]

3. **Disclosure of Revenue-Sharing Arrangement**

---

[2] Although *Divane* is controlling, the plaintiff's argument is not entirely without merit. Suppose there are two plans. In Plan A, the fiduciary shops around and selects a company offering a range of passive and actively managed funds that all have reasonable performance and lower-than-average fees. In Plan B, the fiduciary chooses a fund manager at random and the plan ends up with a range of passive index funds and actively managed funds with high fees. Has the latter fiduciary satisfied his obligations merely because the plan's participants still have the option to select a low-cost index fund and thus avoid the high fees? Arguably no. Plan fiduciaries must act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits" and "defraying reasonable [plan] expenses." 29 U.S.C. 1104(a)(1)(A). The participants in Plan B, many of whom will select the higher-cost actively managed funds, will end up paying higher prices (which compound over time) due to their fiduciary's neglect. That the fund participants *could* avoid the higher-fee funds does not relieve the fiduciary of the performance of his own duties. In its May 25, 2021 amicus brief to the Supreme Court, the Department of Justice agrees. *See* https://www.supremecourt.gov/docket/docketfiles/html/public/19-1401.html, last visited September 24, 2021. ("Under the law of trusts, which informs ERISA's fiduciary standards, fiduciaries are not excused from their

The plaintiff also alleges that the defendants failed to properly disclose revenue sharing information to participants. But controlling precedent indicates that fiduciaries are not required to disclose "information about the revenue-sharing arrangement." *Hecker*, 556 F.3d at 586. Indeed, all that matters is the total fee amount, not how those fees are allocated and distributed. *Id.* "The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." *Id. See also Spano v. The Boeing Co.*, 125 F. Supp. 3d 848, 863 (S.D. Ill. 2014) ("even if Participants were not clearly apprised of the revenue sharing fee component, every participant was made aware of the total fees they paid.") Although the plaintiff believes *Hecker* is no longer good law, that's not true. When given the chance to overrule *Hecker,* the circuit declined. *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) ("Plaintiffs do not persuade us to overrule *Hecker*.")

4. **Investment Services**

The complaint also alleges that the defendants failed to follow a prudent process in selecting Prudential's GoalMaker Asset Allocation Service. Compl. ¶¶ 155–86. The plaintiff asserts that the Prudential GoalMaker asset allocation service funneled employees' retirement savings into imprudent funds that paid excessive fees to Prudential and mostly excluded low-cost index funds that did not pay fees to Prudential. GoalMaker is a service that "allocates the participant's assets in a model portfolio based on his or her retirement goals and risk tolerance." *Miller v. AutoZone, Inc.,* No. 219CV02779MSNTMP, 2020 WL 6479564, at *1 (W.D. Tenn. Sept. 18, 2020). Plan participants could elect to participate in GoalMaker or choose their investments themselves. According to the complaint, participants in the

---

obligations not to offer imprudent investments with unreasonably high fees on the ground that they offered other prudent investments.")

GoalMaker service had their assets directed towards funds with excessive fees. In particular, some $25,000,000 of the plan's assets was invested in the Prudential Guaranteed Income Fund, which charged highly inflated fees compared not only to competitors, but to the fees Prudential charged its other clients. Compl. at ¶ 173. A prudent fiduciary, the complaint argues, would not have selected such a fund.

Once again, however, this claim is precluded by *Divane*. There, the Seventh Circuit concluded that because plan participants had the option of choosing less expensive funds, the fiduciary had performed its role adequately. Here, no participant was forced to use the GoalMaker service, and so they were able to choose low-expense funds if they wanted. Thus, "the types of funds plaintiffs wanted (low-cost index funds) were and are available to them, eliminating any claim that plan participants were forced to stomach an unappetizing menu." *Divane,* 953 at 991 (internal quotation marks omitted). Thus, any claims based on offering the GoalMaker service should be dismissed.

### C. Remaining Claims

In claims one and two, the complaint refers not just to a breach of fiduciary duty, but also to a breach of the duty of loyalty. Any loyalty claim with respect to count two is precluded by *Divane,* for the reasons given above. As for count one, the recordkeeping fees claim, other courts have recognized that the plaintiff must allege something more than a fiduciary breach to plausibly plead a breach of loyalty. "[M]ost courts require something more, such as an allegation supporting an inference of self-dealing, to survive a motion to dismiss." *Martin v. CareerBuilder, LLC,* No. 19-CV-6463, 2020 WL 3578022, at *6 (N.D. Ill. July 1, 2020). Here, the gist of the complaint is that the defendants were negligent, or even lazy, but there is no allegation that their failure to shop or negotiate for better recordkeeping fees somehow

17

enriched them. Thus, to the extent the plaintiff is attempting to plead a breach of loyalty, such claim should be dismissed.

Finally, in claims three and four, the complaint alleges that the defendants breached their duty to monitor. Because the plaintiff has stated a claim with respect to the recordkeeping fees, it has also stated a claim (claim three) alleging that the defendants failed to monitor individuals responsible for keeping recordkeeping fees reasonable. But because it has failed to state a claim for breach of fiduciary duty with respect to investment management fees, her breach of the duty to monitor claim (claim four) should be dismissed. *See Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) ("[A] failure to monitor claim is derivative in nature and must be premised [on] an underlying breach of fiduciary duty. Without an underlying breach of fiduciary duty, [the plaintiff's] claim for failure to monitor fails on its merits." (citations omitted)).

## CONCLUSION

For these reasons, I recommend that the defendants' motion to dismiss (Dkt. No. 9) be **GRANTED** in part: claims two and four are precluded by *Divane,* and the plaintiff lacks standing to bring claim five. I further recommend that the motion be **DENIED** with respect to claims one and three, which I believe state valid claims for breach of fiduciary duties (but not for breach of the duty of loyalty) based on the defendants' alleged failure to shop for or negotiate recordkeeping fees.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Civ. P. 72(b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this Recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic

18

Case 1:20-cv-01534-WCG   Filed 09/30/21   Page 18 of 19   Document 27

case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 30th day of September, 2021

_____
Stephen C. Dries
United States Magistrate Judge