# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**GENNA B. LAABS,**
*individually, and as representative of a class of participants and beneficiaries of the Faith Technologies Incorporated 401(k) Retirement Plan,*

    **Plaintiff,**

    v.                    Case No. 20-CV-1534-WCG-SCD

**FAITH TECHNOLOGIES, INC.,** and

**BOARD OF DIRECTORS OF FAITH TECHNOLOGIES, INC.,**

    **Defendants.**

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

      Genna Laabs, a participant in the Faith Technologies Incorporated 401(k) Retirement Plan, has filed a proposed class action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101–1461, against Faith Technologies, Inc., and the board of directors of Faith Technologies, Inc. (collectively, "Faith Technologies"). United States District Judge William C. Griesbach has referred the case to me to address any motions. This report and recommendation addresses Faith Technologies' motion to dismiss Laabs' amended complaint. Because Laabs has failed to plausibly allege that the defendants breached their fiduciary duties, I recommend that the court grant the defendants' motion. Moreover, because Laabs has already been given a chance to amend, and because she did not seek leave to amend again in response to the defendants' motion, I recommend that the court dismiss Laabs' claims with prejudice.

## BACKGROUND

Faith Technologies, Inc., offers its employees retirement benefits via the Faith Technologies Incorporated 401(k) Retirement Plan. Am. Compl. ¶ 5, ECF No. 54. The plan is a defined contribution pension plan under 29 U.S.C. § 1002(34), meaning that Faith Technologies' contributions to the payment of plan costs is guaranteed but the pension benefits are not. *Id.* ¶ 31. Faith Technologies is the plan sponsor and plan administrator of the plan. *Id.* ¶ 30. Since 2009, the plan has received recordkeeping and administrative services from Prudential Retirement Insurance & Annuity Company. *Id.* ¶¶ 6, 75. Prudential offers plan participants several optional services and funds, including the GoalMaker asset allocation service and the Guaranteed Income Fund (GIF). *Id.* ¶¶ 7–8. In 2021, the plan had over $300 million in assets and more than 3,000 participants, making it one of the largest defined contribution plans in the nation. *Id.* ¶¶ 32–33.

Laabs worked for Faith Technologies from September 2018 until September 2020. Am Compl. ¶ 22. During the putative class period—October 2014 through the date of judgment—Laabs was a participant in the plan, was enrolled in GoalMaker, and held investments in the Prudential GIF. *Id.* ¶¶ 6, 21–23. In October 2020, Laabs filed suit individually and as representative of a putative class of plan participants and beneficiaries against Faith Technologies, its board of directors, and unnamed members. *See* Compl., ECF No. 1. Laabs filed an amended complaint in December 2022 asserting four causes of action against Faith Technologies and its board of directors.[1] *See* Am. Compl. ¶¶ 169–208. The main thrust of the amended complaint is that the defendants breached their fiduciary duties under ERISA during the putative class period. Faith Technologies has moved to dismiss the amended

---
[1] For a more robust procedural history, see the court's prior report and recommendation, ECF No. 51.

complaint with prejudice for failure to state a claim upon which relief can be granted. *See* Defs.' Mot., ECF No. 57. That motion is fully briefed and ready for resolution. *See* Defs.' Mem., ECF No. 58; Pl.'s Resp., ECF No. 60; Defs.' Reply, ECF No. 61; Pl.'s Suppl. Br., ECF No. 69; Defs.' Suppl. Br. 70.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, a complaint must "allege[] facts that show the claim is 'plausible on its face.'" *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha*, 947 F.3d at 469 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

When analyzing a motion to dismiss pursuant to Rule 12(b)(6), courts must "construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha*, 947 F.3d at 469 (citing *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013)). However, courts "need not accept as true . . . unsupported conclusory factual allegations." *Divane v. Northwestern Univ.*, 953 F.3d 980, 987 (7th Cir. 2020) (quoting *Yeftich*, 722 F.3d at 915), *vacated and remanded on other grounds sub nom. Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022) ("*Hughes I*")). Courts may also "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Divane*, 953 F.3d at 987 (quoting *Tricontinental Indus. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007)).

3

"In putative ERISA class actions, Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Courts apply a 'careful, context-sensitive scrutiny of a complaint's allegations' to 'divide the plausible sheep from the meritless goats.'" *Id.* "Because 'the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, [] courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.'" *Albert*, 47 F.4th at 577 (quoting *Hughes I*, 142 S. Ct. at 742). As such, the Seventh Circuit has held that, "[w]hen claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable." *Divane*, 953 F.3d at 988 (citing *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016)).

## DISCUSSION

Laabs asserts that the defendants breached their fiduciary duties concerning certain plan expenses and investments. To state a breach of fiduciary duty claim under ERISA, "a plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Albert*, 47 F.4th at 579 (quoting *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)). The first and third elements are not at issue here. Rather, Faith Technologies insists that Laabs has failed to plausibly plead that the defendants breached their duty of prudence and duty to monitor other fiduciaries.

### I. Duty of Prudence Claims

ERISA "requires plan fiduciaries to act prudently when managing an employee benefit plan." *Albert*, 47 F.4th at 578 (citing 29 U.S.C. § 1104(a)(1)(B)). A plan fiduciary must discharge its duties "with the care, skill, prudence, and diligence under the circumstances then

4

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*") (quoting 29 U.S.C. § 1104(a)(1)). As the Eighth Circuit explained in *Matousek v. MidAmerican Energy Co.*, "[t]he process is what ultimately matters, not the results." 51 F.4th 274, 278 (8th Cir. 2022) (citing § 1104(a)(1)(B)); *see also DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990) ("[T]he ultimate outcome of an investment is not proof of imprudence.").

The duty of prudence includes "a continuing duty to monitor . . . investments and remove imprudent ones." *Hughes II*, 63 F.4th at 626 (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) ("*Tibble I*"). "This continuing duty to monitor is a subset of the duty of prudence . . . and includes two related components." *Hughes II*, 63 F.4th at 626. "First, the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment." *Id.* (citing *Tibble I*, 575 U.S. at 529). "Second, the duty of prudence requires a plan fiduciary to 'incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship.'" *Hughes II*, 63 F.4th at 627 (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) ("*Tibble II*")).

Here, Laabs asserts that the defendants breached their duty of prudence by authorizing the plan to pay unreasonably high fees for recordkeeping and administrative services, by failing to timely remove its longtime recordkeeper, and by offering needlessly expensive investment options.

5

A. Recordkeeping and administrative fees (Count I)

Laabs maintains that, during the putative class period, Faith Technologies paid too much to and failed to timely remove its recordkeeper, Prudential. Because she doesn't know what process Faith Technologies used to select, retain, or determine the fees paid to Prudential, Laabs does not allege any direct instances of misconduct or mismanagement. Instead, Laabs says we should infer an imprudent decision-making process from circumstantial evidence, including Faith Technologies' failure to regularly monitor the plan's recordkeeping fees, failure to regularly solicit quotes or competitive bids from Prudential and other recordkeepers, and failure to leverage its substantial bargaining power to negotiate a lower fee. *See* Am. Compl. ¶¶ 11, 32, 84, 92–93, 101, 110, 175.

To support this theory, Laabs compares publicly available data for the Faith Technologies plan with eight allegedly comparable plans that are supposedly prudent when it comes to recordkeeping fees. *See* Am. Compl. ¶¶ 91–121. The comparator plans had between about 1,500 and 17,000 participants, had total assets ranging from about $300 million to $2.5 billion, and paid a total annual recordkeeping fee of $20 to $52 per plan participant:

| Plan | Partici-pants | Assets | Bundled RKA Fee ($) | Bundled RKA Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|---|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $45,030 | $30 | Fidelity |
| Verso Retirement Savings Plan for Bargained Employees | 2,210 | $346,192,939 | $114,920 | $52 | Transamerica |
| **Faith Plan Average Fee** | **2,925** | **$206,048,060** | **$292,636** | **$100** | **Prudential** |
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $812,598,602 | $256,515 | $49 | Fidelity |

| Mercedes-Benz USA, LLC Employees' Retirement Savings Plan | 5,659 | $702,141,779 | $294,268 | $52 | Voya |
| --- | --- | --- | --- | --- | --- |
| Consumers Energy Company Employees' Savings Plan | 11,320 | $2,478,855,430 | $475,440 | $42 | Fidelity |
| JBS 401(K) Savings Plan | 14,255 | $311,864,034 | $285,100 | $20 | Empower |
| Dollar General Corp 401(K) Savings and Retirement Plan | 16,125 | $356,929,661 | $516,000 | $32 | Voya |
| Team Health 401(k) | 17,237 | $1,280,891,222 | $430,925 | $25 | Schwab |

*Id.* ¶ 96. Laabs indicates that she based her calculations on publicly available information from participant fee disclosures or financial statements. *Id.* By contrast, from 2014 through 2022, the Faith Technologies plan averaged about 3,000 participants, nearly $200 million in total assets, and a total annual recordkeeping fee of $100 per plan participant:

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Participants** | 2,086 | 2,287 | 2,558 | 2,850 | 3,399 | 3,435 | 3,121 | 3,293 | 3,293 | *2,925* |
| **Est. Bundled RKA Fees** | $244,660 | $252,689 | $279,152 | $346,728 | $282,879 | $253,853 | $295,553 | $339,107 | $339,107 | *$292,636* |
| **Est. Bundled RKA Per Participant** | $117 | $110 | $109 | $122 | $83 | $74 | $95 | $103 | $103 | *$100* |

*Id.* ¶¶ 95–96. Based on a trend line constructed from this data, Laabs alleges that "a hypothetical prudent plan fiduciary would have paid on average an effective annual [recordkeeping] fee of around $42 per participant, if not lower":



*Id.* ¶¶ 98, 102. According to Laabs, the unreasonably excessive recordkeeping fees paid by the Faith Technologies plan cost its participants millions of dollars. *See id.* ¶¶ 102–07.

Faith Technologies argues that the Seventh Circuit's decision in *Albert* requires dismissal of Laabs' recordkeeping fees claim. In *Albert*, the Seventh Circuit affirmed the dismissal of a similar recordkeeping claim that relied on a price comparison of fees charged to other plans. *See Albert*, 47 F.4th at 579. The court first reiterated its prior holdings "that the cheapest investment option is not necessarily the one a prudent fiduciary would select," *id.* (citing *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011), and "that a failure to regularly solicit quotes or competitive bids from service providers" does not, as a matter of law, breach the duty of prudence, *Albert*, 47 F.4th at 579 (citing *Divane*, 953 F.3d at 990–91).

Because at the time *Hughes* was still pending on remand from the Supreme Court, the court looked elsewhere for guidance. It relied primarily on *Smith v. CommonSpirit Health*, a case in which the Sixth Circuit "held that an ERISA plaintiff failed to state a duty of prudence

8

claim where the complaint 'failed to allege that the [recordkeeping] fees were excessive relative to the services rendered.'" *Albert*, 47 F.4th at 580 (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)). The Seventh Circuit determined that the complaint in its case did not provide "'the kind of context that could move [the recordkeeping] claim from possibility to plausibility' under *Twombly* and *Iqbal*." *Id.* Nevertheless, the court emphasized "that recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss." *Albert*, 47 F.4th at 580 (quoting *Dudenhoeffer*, 573 U.S. at 425).

After the parties in our case briefed Faith Technologies' motion to dismiss, the Seventh Circuit issued its decision in *Hughes II*. The court clarified the pleading standard for ERISA duty-of-prudence claims, explaining that "a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Hughes II*, 63 F.4th at 630 (citing *Hughes I*, 142 S. Ct. at 742). "How wide that range of reasonableness is will depend on 'the circumstances . . . prevailing at the time the fiduciary acts.'" *Hughes II*, 63 F.4th at 630 (quoting *Dudenhoeffer*, 573 U.S. at 425). The court also reiterated that "[t]he discretion accorded to an ERISA fiduciary 'will necessarily be context specific.'" *Id.* And it further explained that "the duty of prudence includes a continuing duty to monitor plan expenses and 'incur only costs that are reasonable in amount and appropriate' with respect to the services received." *Hughes II*, 63 F.4th at 631 (quoting *Tibble II*, 843 F.3d at 1197).

Applying that "newly formulated pleading standard," the *Hughes II* court reversed the dismissal of an excessive recordkeeping fees claim. *Hughes II*, 63 F.4th at 630–34. The court distinguished *Albert*, noting that the complaint in its case alleged that "the quality or type of recordkeeping services provided by competitor providers [were] comparable to that provided

9

by" the plan's recordkeepers. *Hughes II*, 63 F.4th at 632. The court further noted that the complaint alleged that recordkeeping services for all "jumbo plans . . . are fungible and that the market for them is highly competitive." *Id.* In other words, unlike the plaintiffs in *Albert*, the plaintiffs in *Hughes II* provided the required context to allege that their plan's recordkeeping fees "were excessive relative to the recordkeeping services rendered." *Id.* (citing *Smith*, 37 F.4th at 1169).

Like the complaint in *Hughes II*, the operative complaint here includes the allegations missing from the complaint in *Albert* about the quality or type of services provided. Specifically, the amended complaint alleges that Prudential provided plan participants standardized, bundled recordkeeping and administrative services that all "large" 401(k) plans—those with between $100 and $500 million in assets—receive from their recordkeepers. *See* Am. Compl. ¶¶ 27, 39–71. It also alleges that recordkeepers for all large plans provide more or less the same level and quality of service and that any minor variations do not materially affect the fees charged. *See id.* ¶¶ 39–71. Thus, according to the amended complaint, the market for recordkeeping services is highly price-competitive for large plans, such that plans with more participants generally can negotiate a lower per-participant rate. *See id.* ¶¶ 41–43, 57–66. Given these allegations, Laabs asserts that the Faith Technologies plan's fees were excessive relative to the services received, as the plan could have obtained the same recordkeeping services for less from other, similar recordkeepers. *See id.* ¶¶ 91–121.

Contrary to Faith Technologies' suggestion, Laabs does not need to describe the specific recordkeeping and administrative services received by the Faith Technologies plan and the comparator plans. In *Hughes II*, the Seventh Circuit clarified that level of specificity is not required at the pleading stage. The complaint in *Hughes II* alleged that there were

10

"numerous recordkeepers in the marketplace who [were] *equally* capable of providing a high level of service to large defined contribution plans like the Plans." *Hughes II*, 63 F.4th at 632. That allegation, according to the court, suggested that the quality or type of recordkeeping services provided by other recordkeepers was comparable to that of the plan's recordkeepers. Likewise, the operative complaint in this case alleges that other recordkeepers were providing the same level and quality of service to other large plans as Prudential provided to the Faith Technologies plan. It also alleges that the plan received a standard bundle of recordkeeping services.[2] Faith Technologies says that such conclusory allegations, with no supporting facts, cannot survive a motion to dismiss. However, the allegations in *Hughes II* were arguably more conclusory and less supported than the allegations here, and yet the Seventh Circuit found them sufficient.

Faith Technologies also argues that certain allegations in the amended complaint undermine Laabs' assertion that all large plans receive materially similar services from their recordkeepers. For example, paragraph 84 of the amended complaint indicates that, after receiving a competitive bid, "prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary." Am. Compl. ¶ 84. Faith Technologies says this admission alone "is fatal to [Laabs'] entire theory that all recordkeeping services are the same." Defs.' Mem. at 12. Laabs, however, does not allege that all recordkeepers provide the exact same level and quality of service. Rather, she alleges that any minor variation in the level and quality of recordkeeping services has little material

---

[2] The amended complaint supports these factual allegations by citing to, among other sources, plan documents and several secondary sources. *See* Am. Compl. ¶¶ 45, 47, 57–60, 65–66, 68.

impact on the fees charged. Paragraph 84 merely suggests that a fiduciary that has received a bid from another recordkeeper should be able to find a recordkeeper that provides the same (or slightly better) services for less; it does not undermine Laabs' allegations about the fungibility of recordkeeping services for large 401(k) plans.[3]

Pleading that recordkeeping fees were too high, however, is not sufficient to state an ERISA duty-of-prudence claim. Rather, the plaintiff must "plead[] sufficient facts to render it plausible that [the plan] incurred *unreasonable* recordkeeping fees." *Hughes II*, 63 F.4th at 631 (emphasis added). In *Matousek*, the Eighth Circuit explained that "[t]he key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" 51 F.4th at 278 (quoting *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). The Seventh Circuit embraced that rule in *Albert*, as it relied on the same *Davis* quote to affirm the dismissal of two duty-of-prudence claims. 47 F.4th at 581–82 (quoting *Davis*, 960 F.3d at 484). And in *Hughes II* the court found it crucial that the plaintiffs had alleged that the proposed alternative fee was reasonable "based on the services provided by existing recordkeepers and the Plans' features." 64 F.4th at 632. Indeed, Laabs concedes that she "must use a 'sound basis for comparison—a meaningful benchmark.'" Pl.'s Resp. at 13 (quoting *Coyer v. Univar Sols. USA Inc.*, No. 1:22 CV 0362, 2022 WL 4534791, 2022 U.S. Dist. LEXIS 175972, at *13 (N.D. Ill. Sept. 28, 2022)).

Unlike the factual allegations in *Hughes II*, the alleged facts in this case do not render it plausible that the proposed alternative fee—here $42 per participant—was a reasonable

---

[3] Part of Laabs' recordkeeping duty-of-prudence claim is that Faith Technologies did not regularly solicit quotes or competitive bids from other recordkeepers. In other words, Laabs alleges that Faith Technologies lacked a reliable reference point for determining whether its recordkeeping fees were reasonable.

12

recordkeeping fee. Laabs arrived at that $42 figure from a trend line based on the fees paid by eight other plans. She says that recordkeeping services essentially are the same for all large 401(k) plans, which she defines as plans with between $100 million and $500 million in assets. But half of the eight comparator plans had more than $500 million in assets, and the amended complaint does not contain any allegations about the recordkeeping services of such plans.

Similarly, the so-called comparators vary significantly in size. The largest plan, Team Health, had nearly eleven-and-a-half times as many participants as the smallest plan, Trinity Health (17,237 vs. 1,501), and the Faith Technologies plan had fewer participants (on average 2,925) than all but two of the comparator plans. As for asset size, the Faith Technologies plan is by far the smallest plan. The next smallest comparator plan, JBS, had over fifty percent more assets ($311,864,034 vs. $206,048,060), and the largest comparator plan, Consumers Energy Company, had over twelve times the amount of assets ($2,478,855,430 vs. $206,048,060). Thus, Laabs is not comparing apples to apples.

Courts may permissibly question a plaintiff's selected comparators at the pleadings stage of litigation. In *Albert*, the Seventh Circuit explained that providing a meaningful benchmark is a pleading requirement, and the court affirmed the dismissal of several ERISA fiduciary-breach claims at the pleadings stage because the plaintiff failed to "provide a sound basis for comparison—a meaningful benchmark." 47 F.4th at 581–82 (quoting *Davis*, 960 F.3d at 484). Laabs insists that her proposed benchmarks should be accepted as true. However, her own allegations—not a factual dispute—show that her selected comparator plans do not provide a sound basis for comparison.

Because several of the comparator plans do not meet Laabs' definition of a "large" plan, and because the plans are not similarly sized, the proposed trend line cannot be used to

13

derive a reasonable fee. Therefore, Laabs has no basis to allege that the plan's recordkeeping fees were excessive relative to the services rendered.[4] *See Miller v. Packaging Corp. of Am., Inc.*, No. 1:22-cv-271, 2023 WL 2705818, 2023 U.S. Dist. LEXIS 55337, at *18 (W.D. Mich. Mar. 30, 2023) (dismissing a similar recordkeeping fees claim in part because the plaintiff's comparators "varied greatly in terms of the number of participants and the amount of assets held"); *England v. Denso Int'l Am., Inc.*, No. 22-11129, 2023 WL 4851878, 2023 U.S. Dist. LEXIS 131386, at *11–12 (E.D. Mich. July 28, 2023) (same); *Mateya v. Cook Grp. Inc.*, No. 1:22-cv-01271-RLY-TAB, 2023 WL 4608536, 2023 U.S. Dist. LEXIS 124838, at *14–15 & n.4 (S.D. Ind. June 16, 2023) (same); *Sigetich v. Kroger Co.*, No. 1:21-cv-697, 2023 WL 2431667, 2023 U.S. Dist. LEXIS 40359, at *23–24 (S.D. Ohio Mar. 9, 2023) (same); *Probst v. Eli Lilly & Co.*, No. 1:22-cv-01106-JMS-MKK, 2023 WL 1782611, 2023 U.S. Dist. LEXIS 19172, at *35–36 (S.D. Ind. Feb. 3, 2023) (same); *Mator v. Wesco Distrib. Inc.*, No. 2:21-CV-00403-MJH, 2022 WL 3566108, 2022 U.S. Dist. LEXIS 147802, at *24–25 (W.D. Pa. Aug. 18, 2022) (same).

Without the comparison to fees paid by other plans, Laabs simply alleges in conclusory fashion that the Faith Technologies plan paid too much for the same quality of services and failed to regularly solicit competitive bids for recordkeeping fees. Those allegations, however, are not enough to cross the line from possibility to plausibility. Laabs therefore has failed to state a duty-of-prudence claim regarding the Faith Technologies plan's recordkeeping and administrative fees.

---

[4] Laabs' graph also contradicts her allegation that more participants means a lower recordkeeping fee. As just one example, the Trinity Health plan had just 1,501 participants and paid $30 per participant for recordkeeping services; in contrast, the Consumers Energy Company plan had more than seven-and-a-half times the number of participants (11,320) but still paid $12 more ($42 total) per participant. *See* Am. Compl. ¶¶ 96–100.

## B. Investment management (Count II)

Laabs maintains that the defendants also breached their duty of prudence by not removing two "high-cost and low-performing" investment options: the GoalMaker asset allocation service and the Prudential GIF stable value fund. *See* Am. Compl. ¶ 7.

### 1. GoalMaker

GoalMaker is an optional service furnished by Prudential that purports to automatically diversify a participant's investments among several investment options in the Faith Technologies plan. Am. Compl. ¶ 151. According to the amended complaint, GoalMaker is similar to a target retirement date fund in that it uses "proprietary algorithms to allocate a participant's savings among the funds in the Plan's GoalMaker investment menu" and "periodically rebalances this asset allocation in the same manner as a target retirement date fund." *Id.* ¶ 155. "However, GoalMaker's investment menu is almost entirely high expense ratio actively managed funds, which makes this approach far more expensive than most target-date funds." *Id.*

Laabs asserts that the defendants failed to monitor the GoalMaker funds and continued to retain the GoalMaker service despite ongoing underperformance compared to their benchmarks. Am. Compl. ¶ 158. Specifically, Laabs alleges that GoalMaker's fees are "demonstrably higher" than comparable target date funds offered by Fidelity and Vanguard. *Id.* ¶ 154. Laabs alleges that, like GoalMaker, target date funds are "structured to grow assets within a set time frame defined by the participant's expected retirement year" and "are designed to be the only investment vehicle that an investor uses to save for retirement." *Id.* ¶ 153. The amended complaint includes a chart comparing GoalMaker's fees to the Vanguard

TDF fees from 2014 through 2021. *Id.* ¶ 156. Laabs asserts that the excess GoalMaker fees cost plan participants over $4.7 million in retirement plan losses over that time. *Id.* ¶¶ 156–57.

Faith Technologies argues that Laabs' GoalMaker theory fails because the amended complaint does not allege facts demonstrating that her preferred alternative investment options are meaningful benchmarks. I agree. The amended complaint alleges that all target date funds are similar to GoalMaker because both products allocate a participant's savings among funds in the investment menu and periodically rebalance a participant's asset allocation over time. These surface-level similarities are insufficient to create an inference of imprudence based solely on GoalMaker's higher fees. The amended complaint does not contain any allegations about the comparators' investment strategies, asset allocations, or risk allocations. *See Smith*, 37 F.4th at 1167 (finding index funds to be "inapt comparators" to a plan's funds—despite being sponsored by the same company, being managed by the same team, and using a similar allocation of investment types—because "each fund has distinct goals and distinct strategies"); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823–24 (8th Cir. 2018) (finding that the plaintiff failed to plead a meaningful benchmark in part because his preferred alternative fund used a different investment strategy than the fund he invested in). Moreover, the amended complaint never identifies the fees of the Fidelity TDF. "In the absence of more detailed allegations providing a 'sound basis for comparison,'" Laabs' GoalMaker theory cannot support a plausible inference of imprudence. *Albert*, 47 F.4th at 582 (quoting *Meiners*, 898 F.3d at 822).

2.  **Prudential GIF**

The Prudential GIF is a type of stable value fund. Am. Compl. *See* ¶¶ 122–30. A stable value fund is "similar to a money market fund in that it provides liquidity and principal

16

protection[] and . . . similar to a bond fund in that it provides consistent returns over time. *Id.* ¶ 125. However, unlike a money market fund or a bond fund, a stable value fund "seeks to generate returns greater than a money market and equivalent to a short – to  intermediate – term bond fund." *Id.* The Prudential GIF was the Faith Technologies plan's largest investment, averaging about $25 million in participants' retirement savings. *Id.* ¶ 122.

Laabs asserts that the defendants failed to monitor the costs of the Prudential GIF and continued to retain that stable value fund even though "[a]n *identical* product was available with higher crediting rates and lower spread fees." Am. Compl. ¶¶ 132–33. According to the amended complaint, the Prudential GIF "consistently charged the Faith Tech employees on average 119 basis points more and, consequently, returned 119 basis points less than *the very same fund offered by Prudential to another similarly situated retirement plan*, the WEA Plan." *Id.* ¶ 133. Laabs alleges that the failure to timely remove the Prudential GIF resulted in nearly $2 million in lost retirement savings. *Id.* ¶¶ 133–35. Laabs further alleges that the Faith Technologies plan should have leveraged its substantial bargaining power to obtain better crediting rates, like the VSP Retirement Plan did. *See id.* ¶¶ 136–141. Laabs also alleges that the Prudential GIF wad not adequately diversified. *Id.* ¶ 142.

As with the GoalMaker theory, Faith Technologies argues that Laabs has failed to sufficiently allege a meaningful benchmark to support her Prudential GIF theory. Again, I agree. Laabs does not provide any facts to support her conclusory allegation that the Prudential GIF provided to the WEA plan was identical to the Prudential GIF provided to the Faith Technologies plan or that the WEA plan was similarly situated to the Faith Technologies plan. For example, the amended complaint says that a plan with significant assets in a stable value fund can use its bargaining power to obtain a superior product with

17

higher crediting rates, but it does not allege how much the WEA plan invested in its Prudential GIF or how many participants were in the WEA plan. *Cf. Hughes II*, 63 F.4th at 634–36 (allowing an investment management duty-of-prudence claim to proceed where the plaintiff alleged that the comparator investment option was identical in all respects—same manager, managed the same, and investments in the same portfolio—other than the fees charged).

Likewise, Laabs does not provide any facts from which we can infer that the VSP Retirement Plan was a meaningful comparator for the Faith Technologies plan. The amended complaint does not allege how much the VSP Retirement Plan invested in its stable value fund, so we don't know how much bargaining power that plan had. The amended complaint also vaguely alleges that the VSP Retirement obtained a superior product with crediting rates "in the range of three percent" without specifying the fees associated with that investment and acknowledges that the VSP Retirement Plan had more than twice as many participants as the Faith Technologies plan (about 6,300 vs. on average 2,925). *See* Am. Compl. ¶ 141. Finally, by offering just a single comparator, the amended complaint lends itself to reasonable accusations of cherry-picking that further undermine any inference of plausibility. In sum, the lack of a meaningful benchmark dooms Laabs' Prudential GIF theory.

## II. Duty to Monitor Claims

Finally, Laabs asserts in Counts III and IV of the amended complaint that the defendants breached their duty to monitor other fiduciaries with respect to recordkeeping and administrative service fees and investment management. *See* Am. Compl. ¶¶ 195–208. Laabs concedes that her duty-to-monitor claims are wholly derivative of her duty-of-prudence claims. *See* Pl.'s Resp. at 21. Because I recommend that the court dismiss Laabs' duty-of-prudence claims, I recommend the derivative duty-to-monitor claims be dismissed as well.

*See Albert*, 47 F.4th at 583 (citing *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010)).

## CONCLUSION

For all the foregoing reasons, I **RECOMMEND** that the court **GRANT** the defendants' motion to dismiss plaintiff's amended complaint, ECF No. 57. Faith Technologies argues for dismissal with prejudice given that Laabs has failed to state a viable claim for relief despite having ample time to replead. Laabs has not responded to that argument. Because Laabs has already amended her complaint once, and because she has not requested leave to amend again, I recommend that this action be **dismissed with prejudice**. *See Matousek*, 51 F.4th at 282–83 (finding no abuse of discretion where a district court dismissed a complaint raising a similar recordkeeping claim "with prejudice without giving the plaintiffs a chance to amend it").

Under 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Civ. P. 72(b)(2), and E.D. Wis. Gen. L. R. 72(c), written objections to any recommendation herein, or part thereof, may be filed within fourteen days of service of this recommendation. The parties must file objections in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated in Milwaukee, Wisconsin, this 30th day of August, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge